## Hahn Estate

Before Klein, P. J., Bolger, Lefever, Saylor and Shoyer, JJ.

*Joseph A. Hagerty,* for exceptants.

*F. Raymond Heuges,* contra.

SAYLOR, J., March 11, 1960.—The four residuary legatees, two of them executors, of the estate of an 87-year-old decedent have filed exceptions to an adjudi-

cation awarding to Evelyn Lienert, a niece, and her husband $6,000, with interest, on their claim that title to a house at 623 East Westmoreland Street, Philadelphia, passed to them at her death on August 14, 1957. Although shortly thereafter claimants demanded the executed deed conveying the property to them, the executors included the property in the inventory, and sold it at private sale on March 11, 1959, without notice to claimants who became aware of the sale upon the filing of the account.

Exceptants argue that there had been no delivery of the deed, and even if there had been, the amount of the award in lieu of the property itself was excessive.

Decedent had been living with her sister, Mrs. Heilman, two years her junior. When the latter became unable any longer to take care of Mrs. Hahn, at Mrs. Hahn's request she informed the attorney who had done her sister's legal work for eight years that it was her sister's desire to convey the house to the Lienerts, reserving a life estate, in consideration of the Lienerts' providing a home and care for her without charge for the rest of her life. So instructed, the attorney prepared the deed and on February 8, 1957, accompanied by a notary appeared at Mrs. Heilmann's house to have it executed. There were present Mrs. Hahn, her sister and her sister's son, Frank Heilmann.

Decedent was in good health but was hard of hearing. Her attorney spoke to her but doubted if she heard him. In any case, he produced the deed by which the grantor conveyed the property to herself "for the rest of her natural life with remainder in fee" to the Lienerts. Mrs. Heilmann said to Mrs. Hahn, "sign the paper", to which Mrs. Hahn replied, "all right". Whereupon, in the presence of witnesses, decedent in a firm, clear hand executed the deed and then signed the receipt for the consideration. No acknowledgment was taken by the notary as the scrivener placed the

deed in his brief case and took his leave accompanied by the notary.

Called as a witness at the audit to produce the deed, the scrivener testified that he had not had the deed acknowledged as he had reached the conclusion that his client was not aware of what she was doing, had not read the deed, had kept silent and had an "unusual blank expression on her face." This despite the fact that as her sister's agent Mrs. Heilmann had communicated Mrs. Hahn's instructions to the attorney to prepare the deed, as in fact he did prepare it, and to arrange for its execution, which he likewise did, and also despite the fact that later on he signed his name to the clause "Sealed and Delivered in the Presence of Us."

The scrivener did not inform the Lienerts, grantees in remainder, that in his opinion the deeding of the property had not been effected. Furthermore, at no time did anyone, including decedent, ever deny his authority for procuring the execution of the deed, and to no one did the scrivener ever communicate any doubts about the arrangements. He kept silent, knowing that Mrs. Heilmann was unable to care for her sister and thought "he would wait to see what developed after that."

Promptly Mrs. Hahn went to the Lienerts' home, and there she resided from February 8 to April 13, 1957, when after an accident she was taken to a hospital and later to a nursing home, where she died on August 14, 1957. The Lienerts fully and conscientiously fulfilled their part of the contract with decedent. Apparently the attorney was aware of this for he testified that he "was in the process of drawing up a supplementary agreement which might go with this deed and cure any possible defect that might have existed in the grant of the real estate." But he did not do this.

Exceptants argue that there was no delivery of the deed. The learned auditing judge carefully reviewed the evidence of decedent's intention to make delivery, which was on more than one subsequent occasion confirmed by the grantor herself. Further recital of the facts is unnecessary. As a chancellor, the auditing judge found that the intention of the grantor was shown by her words and actions and by the circumstances surrounding the transaction: Chambley v. Rumbaugh, 333 Pa. 319, 320, 322; Lewis v. Merryman, 271 Pa. 255, 257.

That the scrivener retained the unacknowledged deed does not alter the situation. He signed the witness clause, said nothing to the parties that could make them aware of any failure to consummate the transaction and was silent when his client took up residence with the Lienerts and continued to receive without charge shelter, care and support from them until her physical condition made it necessary for her to enter the hospital and later the nursing home.

The scrivener could well have been considered as retaining the executed deed in the interest of his client who, after all, had reserved a life estate in the property. "It is not necessary that delivery of a deed should be to the grantee himself, but it is sufficient if it be delivered to a third person to be given by him in turn to the grantee at some specified time, as for example, upon the death of the grantor": Chambley v. Rumbaugh, supra, p. 322.

The grantor's attorney took it upon himself, without a word to anyone, let alone the Lienerts, to decide that the transaction was not consummated. He led them into a false sense of security while they performed their share of the bargain. This can not be ignored by a chancellor. No one at any time, not even the attorney-scrivener, has attempted to assert that the grantor was incompetent and incapable of giving

to her sister, and through her attorney, the instructions that were carried out to the point of taking the acknowledgment to the deed. Decedent was competent. Her deed was executed and delivered, and upon her death the Lienerts became owners of the property.

The Lienerts were entitled to possession of the deed and the property it conveyed when the grantor died on August 14, 1957. The attorney-scrivener was aware of the demand for the deed soon after his clients, the executors, obtained letters testamentary. Failing to receive the deed, the Lienerts had to await the filing of the executors' account in order to present to the auditing judge their claim for the property. Meantime, without notice to the Lienerts, the executors sold the property at private sale on March 11, 1959, for $3,901 as stated in the account which was filed May 25, 1959, and audited in June, July and August. The adjudication was filed December 18, 1959.

The purchaser sold the property for $7,200 and settled for it on September 6, 1959.

The learned auditing judge heard testimony as to the value of the property on the date of decedent's death. A real estate appraiser called by the accountants testified that he had inspected the property on September 12, 1957, and placed upon it a valuation of $4,200. He examined the house thoroughly and found the condition such that in his opinion the sum of over $2,000 would have to be spent to put it in shape for sale at a figure comparable to what neighboring properties had been sold for. Admittedly, he did not know whether the plumbing and heating system were in working order. The water was turned off at the time of inspection. Moreover, he was not sure that the location of the property near a church and a busy commercial center was as important as the condition of the improvements on it.

The two real estate men called by claimants have offices in the vicinity of the house. They made their appraisals on September 23, 1959, by which date the house had been renovated by the first purchaser or his successor in title. One appraiser was unable to inspect the complete interior as he did not get beyond the front parlor. The other inspected the entire house. Both found that improvements and repairs, such as papering and painting and installation of new equipment, had been made in the recent past. Allowing for the expenditures thereby required, and taking into full consideration the prices at which houses in the same row or in the row across the street had in recent years sold for, these appraisers valued the property in August 1957 at $6,000 and $6,200, respectively. They calculated that repairs necessary for a sale would have cost about $1,000.

The learned auditing judge found as a fact that the fair value of premises 623 East Westmoreland Street as of August 14, 1957, was $6,000. There was ample basis for his finding.

As stated by Klein, P. J., in Gifford Estate, 18 D. & C. 2d 769, 772:

. . . the conclusions of the auditing judge, who saw and heard the witnesses, must be given the same effect as the verdict of a jury and will not be disturbed unless there is manifest error or clear mistake."

As in that case, in the present matter before us: "We are not only in full accord with the auditing judge's factual findings, but believe that no other conclusion could have been reached, reasonably, under the existing circumstances": Gifford Estate, supra, p. 772.

After all, the Lienerts were entitled to the property itself and ordinarily would not be relegated to the right merely to receive in dollars the value of it as of the date title passed to them. The equity of third parties, equally innocent in the transaction, has inter-

vened. They have moved in and improved the property and made it their home.

Exceptants have not raised any question of laches here and it would not be equitable to charge claimants with laches. Claimants have relied upon the court to hear and adjudicate their claim at the audit of the executors' account. Apparently they first learned of the sale when the account was filed. There is no evidence of any knowledge on their part that the executors were going to sell or had sold the property to a private buyer in March 1959. There was no evidence that a "for sale" sign was on the premises before that date. Mr. Morris said he did not think there was any. Mr. Brucker did not testify that there was a sign on that property but did say that there was one on another property owned by decedent which was also sold. Mr. Winslow, the accountants' appraiser, testified that he was quite sure there was no sale sign on the property. He alone inspected it before the executors sold it.

There was no testimony adduced by the accountants showing their efforts to sell the property during the 19 months intervening between the death of decedent and the sale on March 11, 1959. There was testimony indicating that the purchaser was a speculator. In justification of the sale for less than the assessment figure of $4,000, without any notice to claimants, not one word of testimony was offered by the executors.

In this case the court is not faced with the situation existing in Earle's Estate, 30 D. & C. 693 (1937). There an heir sought to surcharge the executors for failure to obtain a higher price for improved real estate which they sold. Expert testimony asserted a much greater "potential value", but it was admitted that the market was dormant and sales were few. The court refused to surcharge because there was admitted evidence that the executors had shown due diligence

in securing the best price which the market could give them. There is no such evidence here.

We are of the opinion that there was no error in finding that the deed conveying to claimants a remainder interest in the property effective on the death of decedent was executed and delivered and that the accountants must pay over to claimants the sum of $6,000, with interest from such date.

Accordingly, the exceptions are dismissed and the adjudication is confirmed absolutely.